```
                IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF NORTH CAROLINA

JIM'S PAWN SHOP, INC. d/b/a JIM'S  )
GUN JOBBERY,                       )
                                   )
      Petitioner,                  )
                                   )
                                   )
      v.                           )
                                   )        WESTERN DIVISION
                                   )        NO. 5:05-CV-525-H(3)
CARLTON BOWERS, Director of        )
Industry Operations, Charlotte     )
Field Division, Bureau of          )
Alcohol, Tobacco, Firearms and     )
Explosives,                        )
                                   )
      Respondent.                  )
                                   )
                                   )
                                   )
_____)
                                   )
                                   )
                                   )
JPS OF WILMINGTON  d/b/a JIM'S     )
PAWN & GUN,                        )
                                   )
      Petitioner,                  )
                                   )
      v.                           )
                                   )        SOUTHERN DIVISION
                                   )        No. 7:05-CV-142-H(2)
CARLTON BOWERS, Director of        )
Industry Operations, Charlotte     )
Field Division, Bureau of          )
Alcohol, Tobacco, Firearms and     )
Explosives,                        )
                                   )
      Respondent.                  )
```

1

## ORDER

A two-day bench trial of the above captioned cases was conducted by the undersigned at the United States District Court in Greenville, North Carolina, on August 18 and 19, 2008. This matter comes before the court on petitioners' appeals from respondent's revocations of petitioners' federal firearms licenses. After taking the matter under advisement, the court enters the following findings of fact and conclusions of law.

### General Findings

1. The Gun Control Act, (hereinafter "GCA"), makes it unlawful for any person, except a federal firearms licensee, to engage in the business of dealing in firearms. 18 U.S.C. § 922(a)(1)(A).

2. The GCA further provides that no person shall engage in the business of dealing in firearms until he has filed an application with and received a license to do so from the Attorney General. 18 U.S.C. § 923(a).

3. The Attorney General may revoke any license issued under the GCA if the holder of such license has willfully violated the GCA, or any rule or regulation issued thereunder. 18 U.S.C. § 923(e).

4. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), is the agency charged with the administration and

2

enforcement of the GCA. There are 1750 federal firearm licensees in the region for which Carlton Bowers, ATF's Director, Industry Operations

("DIO"), Charlotte Field Division ("Charlotte region"), supervises, which region includes all of North Carolina and South Carolina.

7. There are 22 ATF inspectors assigned to the Charlotte region, and their responsibilities are related to the 1750 federal firearms licensees (including new applicants for licenses) and to inspections for licensees in the explosives business.

8. For the year 2004, one revocation was recommended by DIO Bowers within the region. For the year 2005, four revocations were recommended by DIO Bowers. (These numbers exclude the present licensees).

9. As an alternative to revocation, in 2004, ATF conducted 3 warning conferences, and pursued additional alternatives to revocation with regard to 6 licensees within the region.

10. As an alternative to revocation, in 2005, ATF conducted 27 warning conferences and pursued additional alternatives to revocation with 13 licensees.

3

## Findings of Fact
## Jim's of Fayetteville

1.   Jim's Pawn Shop Inc. ("Jim's of Fayetteville") is a retailer and pawnbroker who acquires and sells firearms, among other items. Jim's of Fayetteville is a corporation licensed to do business and is doing business in the State of North Carolina as Jim's Gun Jobbery with its principal place of business in Fayetteville, North Carolina. Jim's of Fayetteville is a family-owned business and the largest gun dealer in North Carolina and, apparently, the largest firearms dealer in the two-state ATF Region of North Carolina and South Carolina.   Jim's of Fayetteville is located in close proximity to Fort Bragg, North Carolina, the largest Army installation in the world.   Founded in 1977, Jim's of Fayetteville has been owned continuously by James Faircloth, the president, and operated by him, his wife, and two adult daughters.

2.   Jim's of Fayetteville holds a license issued under the GCA, as amended, as a Dealer including a pawnbroker, in firearms, license number 1-56-026-022L18714.

3.   In 1996, ATF Inspector Darlene Brown conducted her inspection of Jim's of Fayetteville, reviewing the

4

following: inventory, Firearm Transaction Records ATF Forms 4473, which provide transferee and transferor information, and the acquisition and disposition books at Jim's of Fayetteville ("A&D books").

4. As of the time of the 1996 inspection, petitioner had acquired in excess of 100,000 firearms.

5. Brown cited Jim's of Fayetteville for two types of violations. First, Brown found that 362 firearms found in inventory were not recorded as acquisitions in the A&D books. Second, Brown found 1,291 open dispositions, i.e., firearms shown as acquired in the A&D books but that could not be located in the inventory.

6. Inspector Brown testified that she kept the investigation open for almost four years to give the licensee an opportunity to locate the guns for which there were no recorded dispositions. During this time, petitioner determined acquisition information for 276 of the 364 firearms and recorded that information in the A&D books. Petitioner also determined the disposition of 682 firearms during the inspection and recorded that information in the A&D books.

7. Of the 609 firearms for which dispositions could not be determined during the inspection, the dispositions of

5

486 were determined after the inspection and 123 were reported as stolen/missing on an ATF Theft/Loss Report dated February 16, 2000. The acquisition dates on this Report dated back to 1979. The dispositions of 2 of those 123 firearms have since been determined and removed from the Report.

8. By letter dated February 11, 1997, ATF addressed Jim's of Fayetteville's violations and scheduled Jim's of Fayetteville to attend a Warning Conference. Jim Faircloth, president, attended the Warning Conference at ATF's Fayetteville office on February 25, 1997. (Resp't Ex. F-3).

9. By letter dated December 20, 1997, Jim's of Fayetteville advised ATF that it had taken corrective actions and implemented a new standard procedure for recording the acquisition and disposition of firearms. Inspector Brown testified that she had never seen another dealer that had adopted such an extensive manual.

10. After the 1996 inspection, one person at Jim's of Fayetteville was in charge of the firearms records, and the employees were thoroughly trained on a regular basis about the proper way to complete firearms transactions accurately.

11. In July 2000, Inspector Brown and other ATF employees conducted another full inventory inspection at Jim's of Fayetteville. On July 31, 2000, ATF issued a Report of Violations citing Jim's of Fayetteville with errors on 87 out of the 3,040 Forms 4473 which were reviewed and 69 open dispositions in the A&D books where Jim's of Fayetteville failed to timely record the sale or other disposition of firearms. (Resp't Ex. F-5 and F-32.) Following the inspection, petitioner determined the disposition of 53 of the 69 firearms and reported the other 16 as stolen or missing on the proper forms.

12. Inspector Brown testified that the 2000 inspection showed a significant improvement over the 1996 inspection. Inspector Brown reviewed the reported violations with Mr. Faircloth and his employees.

13. In September 2001, ATF Inspectors John Franklin and Ed Courtney conducted an inspection at Jim's of Fayetteville's premises. Unlike the preceding inspections, this inspection was not a complete inspection, but involved a "sampling" of inventory, A&D book entries, and Forms 4473.

14. Forms 4473 for the previous 12 months were inspected. One Form 4473 had an error (transferee answered "yes" to question 9f).

15. Franklin also counted open entries in hundreds of A&D books and compared that number to a physical gun count, and they matched.

16. Franklin compared 200 firearms to the A&D books and found no discrepancies.

17. Franklin found that Petitioner failed to submit one "Report of Multiple Sales"; did not post the "Youth Handgun Safety Notice"; and one "Report of Multiple Sales" omitted 1 of 5 handguns with compromised the multiple sale.

18. Franklin discussed the violations with Mr. Faircloth and his daughters, Jo Faircloth and Jan Faircloth. Mr. Faircloth told his daughters, "If you are going to be in the gun business, you have to comply with the law."

19. Franklin testified, when asked whether he felt that Mr. Faircloth meant what he said when he made that comment, "Yes, I believe he did."

20. A Warning Letter was issued on October 23, 2001, which stated in part, "However, it appears that you have made a concerted effort to comply with the laws and regulations governing firearms transactions." (Resp't Ex. F-7.) When

8

Franklin was asked why the letter said that, Franklin testified that it was because Petitioner had "shown noted improvement." The Letter also specifically stated: "[B]ecause you have had a Warning Conference and now this Warning Letter, any repeat violations will be viewed as willful and could result in the revocation of your Federal Firearms License."

21. When Franklin was asked if he believed that Petitioner had purposefully or willfully violated the law, he answered, "No."

22. During the period of January 28—April 27, 2004, ATF Investigator Tim Mabe conducted a compliance inspection at Jim's of Fayetteville. Over the 55-day period, Jim Mabe was on site for 32 days.

23. During the 2004 inspection, Mabe examined 254 A&D books (covering more than 129,000 acquisitions) and initially determined that there were 230 open dispositions. DIO Bowers later cited Jim's of Fayetteville with 147 open dispositions, after Investigator Mabe and the licensee made efforts to locate guns which were unaccounted for in the A&D books. Of the 230 apparent open dispositions, 68 firearms were actually in the store, 2 were "antique firearms" and did not need

9

to be recorded, 1 had been recorded as open, but was in fact closed (Petitioner's Exhibit 28, Spreadsheet A), 17 were related to duplicate acquisition entries for which a disposition entry was recorded and did not require a duplicate disposition entry (Petitioner's Exhibit 29, Spreadsheets B1-B3), and 21 firearms had been entered as dispositions on the wrong line because of the difficulty in lining up pages, for a total of 109 apparently missing disposition entries which in fact were not missing, leaving 121 dispositions which were not timely recorded.

24. Of those 121 open dispositions, 3 firearms were seized by police (Pet'r Ex. 30, Spreadsheet C); 16 dispositions had not been recorded as dispositions because, although the firearm had been sold and the Form 4473 completed, there was a discrepancy in a serial number which had not been resolved (Pet'r Ex. 31, Spreadsheet D); 17 dispositions were transfers to another store also owned by the owner of Petitioner (Pet'r Ex. 32, Spreadsheet E); 1 disposition was of a firearm which had been on consignment and was taken off consignment by the customer (Pet'r Ex. 33, Spreadsheet F); 5 dispositions were returns to customers of firearms which had been returned to petitioner after being sent to the manufacturer for repair

10

(Pet'r Ex. 34, Spreadsheet G); 10 dispositions were
returns to customers after being repaired on site (Pet'r
Ex. 35, Spreadsheet H); 10 dispositions were of firearms
which were at the manufacturer for repair (Pet'r Ex. 36,
Spreadsheet I); 18 dispositions were sales made with
another firearm in a multiple sale where only one was
recorded as a disposition (Pet'r Ex. 37, Spreadsheet J);
and 3 dispositions were transfers to another licensee
(Pet'r Ex. 38, Spreadsheet K). Nine unrecorded
dispositions had been resolved during the 1996 inspection
(Pet'r Ex. 39, Spreadsheet L), but had not been properly
recorded in the A&D books. Witness Jo Faircloth testified
that Inspector Brown had not instructed her as to how to
properly record the disposition.

25. Petitioner eventually determined all but 35 of the
open dispositions and reported those 35 firearms as
missing/stolen on the Theft/Loss Report.

26. Inspector Mabe also cited Jim's of Fayetteville for
failing to timely record the purchase or other acquisition
of 22 firearms.

27. Of those 22 firearms, 1 of the firearms was recorded
as an acquisition in the A&D Record and one of the other

11

purported firearms was determined not to be a firearm (it was a broken frame).

28. Of the 20 firearms for which dispositions were not recorded, 4 were returns from customers, 1 was returned by a gunsmith, 1 was a firearm which was the property of petitioner which had been temporarily removed from the premises by an agent of petitioner for sporting purposes, 1 was a firearm taken in trade, 4 were firearms taken in pawn, 4 were firearms taken in for repair, 1 was only a receiver which was returned from manufacturer after repair, 1 was only a barreled action which was in the store when the store was purchased, 1 was acquired March 20, 2004 and found in the store on March 31, 2004, and 2 had no information about their acquisition.

29. Mabe examined 2,989 Forms 4473 and found 5 Forms 4473 on which the identification information for the purchaser had not been entered. Each of the 5 transactions involved a regular customer, who was pawning a firearm and had provided the identification document, which was checked against, and verified by, customer information already possessed by petitioner.

30. In reviewing the Forms 4473, Mabe also found that 7 multiple sales were not timely reported. Petitioner made

12

103 multiple sales in 2003, which were reported on a Report of Multiple Sales. Prior to the inspection, Petitioner had a calendar system in place for determining the need to file a Report of Multiple Sales, which required an employee to note on a large calendar each handgun sale each day and to check back five days for every handgun sale to determine if another handgun had been transferred to that purchaser within the past five days.

31. In the 6 instances where a Report of Multiple Sales was not filed, the employee who was responsible for doing so, although she had filed numerous Reports of Multiple Sales previously, had overlooked the calendar entry for the first handgun sale. She was immediately relieved of her duties as they pertained to the firearms records once these oversights were discovered.

32. Petitioner presented the testimony of several witnesses who do business with Jim's of Fayetteville, who testified as to their experiences as customers with Jim's of Fayetteville, noting the fact that they were always asked to fill out the proper forms and that the employees at Jim's took great care to ensure the accuracy of the forms.

13

33. On January 25, 2005, DIO Bowers issued an Amended Notice of Revocation of License, ATF Form 4500 (5300.4) to Jim's of Fayetteville listing violations discovered during the 2004 inspection. On February 3, 2005, Jim's of Fayetteville requested a hearing on the revocation. The hearing occurred on February 23, 2005, at the ATF Office in Fayetteville, North Carolina. (Resp't Ex. F-38). Following the hearing, ATF Hearing Officer Ben Rider found that Jim's of Fayetteville willfully committed numerous violations and recommended that its license be revoked.

34. On June 6, 2005, DIO Bowers issued a Final Notice of Denial of Application or Revocation of Firearms License, ATF Form 5300.13, to Jim's of Fayetteville finding the violations of Jim's of Fayetteville to be willful violations of the GCA, including the failure to account for 147 dispositions, failure to account for 22 acquisitions, 5 Forms 4473 completed without proper identification, and seven failures to properly report multiple sales. (Resp't Ex. F-37).

35. On August 1, 2005, Jim's of Fayetteville filed this action challenging ATF's revocation.

14

## Findings of Fact
## Jim's of Wilmington

1. Petitioner JPS of Wilmington is a corporation licensed to do business and doing business in the State of North Carolina as Jim's Pawn & Gun, with its principal place of business in Wilmington, North Carolina, ( "Jim's of Wilmington"). Mr. James Faircloth is also the president of Jim's of Wilmington. Jim's of Wilmington is a retailer and pawnbroker who acquires and sells firearms, among other items.

2. Jim's of Wilmington holds a license under the GCA, as amended, as a Dealer, including Pawnbroker, license number 1-56-139-01-4M-00743.

3. In June, 1997, ATF Inspector Darlene Brown inspected the records of Jim's of Wilmington.

4. As of the time of the 1997 inspection, Jim's of Wilmington had acquired about 40,000 firearms.

5. Three (3) violations were cited. The first one resulted from the examination of 1,514 Forms 4473, on which errors and omissions were found on 1,148. The second violation was that 59 firearms were redeemed or sold to individuals that did not fully answer Question 8 in Section A of Form 4473. The third violation was that there were

15

199 open dispositions, i.e., firearms shown as acquired in the A&D books but that could not be located in the inventory.

6. Following the 1997 inspection, Inspector Brown sent a Warning Letter to Jim's of Wilmington detailing the violations found during the inspection (Resp't Ex. W-7). The letter specifically stated that "you are warned and advised that a continued disregard for such required recordkeeping will be construed as being willful."

7. In a letter dated July 25, 1997, the president of Jim's of Wilmington, Mr. Faircloth, advised Inspector Brown that petitioner had taken corrective actions, and that the licensee was able to determine the disposition of 79 firearms. A Theft/Loss Report was filed for 120 firearms.

8. In June 2000, ATF Inspectors John Franklin and Daniel Shirley conducted an inspection at Jim's of Wilmington. The 2000 inspection was for a period of approximately twelve months and was not a complete review. It was a review by the sampling of forms (over 300 Forms 4473 were reviewed), the A&D books and the inventory.

9. The June 2000 inspection resulted in the issuance of a Report of Violations that cited Jim's of Wilmington with,

16

among other things, failing to timely record the disposition of 24 firearms in its A&D books. (Resp't Ex. W-8, W-27.)

10. The sampling inspection also found the following violations: the "Youth Handgun Safety Notice" was not posted; 5 multiple sales had not been reported; firearms were transferred to individuals who answered "yes" to question 9c in 2 instances; the serial number for one firearm had been recorded incorrectly in the A&D books; there were 3 double entries in the A&D books; there were 7 errors on Forms 4473; in one instance, Jim's of Wilmington failed to record an FFL number in the A&D books the license number of another licensee to whom a firearm was transferred; and, in one instance, the Curio or Relics license number of a transferee was not recorded in the A&D books.

11. Inspector Franklin explained the violations and the rules and regulations to the licensee. The licensee's manager acknowledged the review with Franklin on June 30, 2000, (Resp't Ex. W-10).

12. Franklin recommended a Warning Conference, but his supervisor said it would "serve no purpose."

17

13. In 2001, AFT Inspector Guilford conducted an inspection in which he found that only 1 multiple sales report had not been filed.

14. From August 10, 2004, to September 2, 2004, ATF Investigator Steve Rapps conducted a compliance inspection at Jim's of Wilmington's. At the time of the inspection, Petitioner had acquired in excess of 50,000 firearms. Rapps examined 115 A&D books and 735 Forms 4473.

15. Rapps initially found 47 apparent open dispositions. Petitioner located a sales invoice or a pawn receipt for 29 of the dispositions, from which Rapps determined that dispositions of 20 had not been entered in the A&D books. A Theft/Loss Report was filed for the 18 firearms for which petitioner did not locate a sales invoice or a pawn receipt or Form 4473. Petitioner subsequently determined that the disposition of one additional firearm could not be determined and filed another Theft/Loss Report.

16. Rapps also found the following: the "Youth Handgun Safety Notice" was not posted; on 28 occasions, petitioner failed to complete a Form 4473; on 3 occasions, petitioner failed to ensure Section A of Form 4473 was completed correctly; 3 Forms 4473 were incorrectly completed in Section 12a; and, on 2 occasions, petitioner failed to

18

record properly the identification of customers on the Form 4473.

17. Of the 28 occasions on which Petitioner allegedly failed to complete a Form 4473, 17 involved sales and 11 involved pawn redemptions. For each one of these transactions, Petitioner produced either a sales invoice or a pawn receipt. (Pet'r Ex. 1-27.)

18. Petitioner presented the testimony of several witnesses who do business with Jim's of Fayetteville and the Faircloth family, who testified as to their experiences as customers, noting the fact that they were always asked to fill out the proper forms and that the employees at Jim's took great care to ensure the accuracy of the forms.

19. Rapps recommended that the federal firearms license for Jim's of Wilmington be revoked based on violations, including the incorrect 4473s, missing 4473s, and dispositions for which the licensee could not account.

20. On January 25, 2005, DIO Bowers issued an Amended Notice of Revocation of License. (Resp't Ex. W-4).

21. Bowers recommended revocation based on repeat violations of the GCA, which violations had occurred again

19

despite prior warnings and reviews of the rules and regulations with the licensee.

22. In a letter dated February 3, 2005, Jim's of Wilmington's president, Jim Faircloth, requested a hearing on the revocation. The hearing occurred on February 24, 2005, at the ATF Office in Fayetteville, North Carolina.

23. Following the hearing, ATF Hearing Officer Ben Rider found that Jim's of Wilmington willfully committed numerous violations and recommended that the subject license be revoked.

24. On June 6, 2005, DIO Bowers issued a Final Notice of Denial of Application or Revocation of Firearms License to Jim's of Wilmington, finding that the violations by the licensee, as listed therein were willful. The violations which were the basis for the revocation were the 28 transfers of firearms without the Form 4473 and the failure to record 19 dispositions of firearms. (Resp't Ex. W-26.)

25. The 28 occasions on which petitioner allegedly failed to complete a Form 4473 were not repeat violations. Of these 28 transfers, 17 occurred prior to December 6, 1999.

26. Of the 20 initially open dispositions for which petitioner located a sales invoice or a pawn receipt, but

20

had not been timely entered in the A&D books, 10 occurred

prior to December 6, 1999.

27. On August 1, 2005, Jim's of Wilmington filed this

action challenging the revocation.

## Conclusions of Law
## Jim's of Fayetteville and Jim's of Wilmington

1. Title 18 U.S.C. § 923(e) provides that "[t]he Attorney

General may, after notice and opportunity for hearing,

revoke any license issued under this section if the holder

of such license has willfully violated any provision of

this chapter."

2. When a petitioner appeals from a license revocation,

the standard of review is de novo by the district court,

and the issue is whether ATF had authority to revoke the

petitioner's license.

3. Revocation of a federal firearms licensee's license

under § 923(e) requires a showing of willfulness.

"Willful," under § 923 "means action taken knowledgeably by

21

one subject to the statutory provisions in disregard of the action's legality. No showing of malicious intent is necessary. A conscious, intentional, deliberate, voluntary decision properly is described as willful, regardless of venal motive." Prino v. Simon, 606 F.2d 449, 451 (4th Cir. 1979).

4. A single willful violation is enough to uphold ATF's revocation. DiMartino v. Buckles, 129 F. Supp. 2d 824, 827 (D. Md. 2001).

5. Respondent relies primarily on the repeat nature of petitioner's violations to establish willfulness.

6. In RSM v. Herbert, 466 F. 3d 316 (4th Cir. 2006), the Fourth Circuit explained:

> To be sure, a single, or even a few, inadvertent errors in failing to complete forms may not amount to "willful" failures, even when the legal requirement to complete the forms was known. Yet *at some point,* when such errors continue or even increase in the face of repeated warnings given by enforcement officials, accompanied by explanations of the severity of the failures, one may infer as a matter of law that the licensee simply does not care about the legal requirements. *At that point,* the failures show the licensee's plain indifference and therefore become willful.

RSM, 466 F.3d at 322 (emphasis in original).

22

7. Rather than compel the court to find willfulness due to petitioners' repeated violations, the holding in RSM empowers the court to infer willfulness at the point repeated violations become sufficient to conclude the licensee does not care to meet its requirements, thereby establishing plain indifference, or willfulness.

8. The court finds that petitioners violated the GCA and its implementing regulations on each of the occasions detailed in the Final Notices. (Fayetteville Final Notice at Resp't Ex. F-38; Wilmington Final Notice at Resp't Ex. W-26.) The court concurs in DIO Bowers' determination that certain enumerated violations were not willful (Id.), and adopts the reasoning related to those violations and set forth in the Final Notices as its own.

9. The court also finds that respondent has not shown, by a preponderance of the evidence, that any of the violations were willful.

10. Jim's of Fayetteville and Jim's of Wilmington took many steps to increase their compliance with the GCA, including printing an employee manual dedicated to proper cataloging techniques, holding repeated training courses on how to keep proper records, establishing a calendar system to keep up with multiple sales, and designating one

23

staff member at each store to be in charge of the A&D books.

11. Respondents argues that the failure to heed the advice of inspectors and install a computer system in either store is evidence of willfulness. However, the court notes that a computer system is not required by the GCA and the testimony at trial established that very few licensees use computer systems.[1] Although a computer system may be helpful, it was not a requirement, and the court will not consider the choice regarding a computer system in its decision on willfulness.

12. Finally, the government's own inspectors uniformly testified that the employees at Jim's of Fayetteville and Jim's of Wilmington were courteous and helpful throughout the inspections and even identified some of their own mistakes for the inspectors.

13. Other than the violations themselves, there was no evidence that petitioners displayed a disregard for the regulations. In fact, the evidence shows the opposite.

14. The evidence shows that Mr. Faircloth told his daughters, "If you are going to be in the gun business, you have to comply with the law." (Findings of Fact as to Jim's of Fayetteville, ¶ 18). The Warning Letter

[1] The testimony at trial revealed that the petitioners are currently in the process of having a computer system installed.

issued to Jim's of Fayetteville on October 23, 2001 stated, "However, it appears that you have made a concerted effort to comply with the laws and regulations governing firearm transactions." (Findings of Fact as to Jim's of Fayetteville, ¶ 20). At both locations, petitioners also went to great lengths to determine the acquisition and disposition of guns where the records were incomplete, even continuing to search for answers following the Notices of Revocation.

15. The 28 occasions on which Jim's of Wilmington failed to complete or maintain a Form 4473 were not repeat violations. (See Findings of Fact as to Jim's of Wilmington, ¶25.)

16. The fact that some of petitioners' violations are *repeat* violations is some circumstantial evidence of the willfulness of those violations. However, while repeated violations can, "at some point," be the basis for inferring willfulness, RSM, 466 F.3d at 322, the court finds, after hearing all the evidence, that the errors made by Jim's of Fayetteville or Jim's of Wilmington do not constitute the type of "conscious, intentional, deliberate, [and] voluntary" actions that are deemed willful. See Prino, 606 F.2d at 451.

17. Rather than willfulness to commit violations, the court finds that the evidence before the court shows, through a pattern of improvement during the years in which the inspections took place, a conscious effort to comply with the GCA. Not only did Jim's of Fayetteville and Jim's of Wilmington put guidelines and training in place, they also significantly reduced the number of errors that were being made. This reduction in the number of errors, especially in light of the volume of firearm transactions, coupled with the testimony by the owners and employees of petitioners, as well as the testimony of some of the inspectors, of petitioners' desire to comply with the GCA, convinces this court that the violations which occurred were not willful as that term has been defined by the Fourth Circuit in Prino and RSM.

18. After consideration of all of the evidence, direct and circumstantial, the court finds that the respondent has failed to establish, by a preponderance of the evidence, that the cited violations were committed willfully. Accordingly, the court finds that respondent was without authority to revoke petitioners' licenses and ORDERS that respondent's previously issued orders revoking petitioners' federal firearms licenses ARE

26

hereby OVERRULED AND SET ASIDE.

This __16th__ day of September 2008.

MALCOLM J. HOWARD
Senior United States District Judge

At Greenville, NC
#26

27